Mr. Battle, before you start, so I just want to make sure that we understand how you intend to divide your time, and I think we have asked the clerk to put the time on the clock for you. Thank you, Your Honor. The clerk has it right. My colleagues have given me a minute each of their time, so I'm going to go for 12 and watch my clock. And then Ms. Landau will argue second, and she'll argue for nine, reserving whatever buttle she and the court managed to hold onto, followed by Mr. Sibeli last. So each may reserve time for rebuttal? I think we all are going to reserve time for rebuttal, so I know I'm going to reserve two minutes. I'm going to argue the first and fourth issues. Ms. Landau is going to argue a jury instruction issue, and Mr. Sibeli is going to argue a different jury instruction issue. But you have 30 total. Right, so 12, nine, and nine. So out of my 12, I'm going to try to hold onto two, and I know that's a struggle sometimes. And then Ms. Landau is going to go. I think she's going to try to hold onto two, and then Mr. Sibeli with the same. And then Ms. Gray will argue for the full 30, and we'll see where we are on our individual clocks. But you really need to stop when your time's up, because your counsel over there, you can see them having fits as you're moving into their time. I'm confident someone's going to stop me at the appropriate time. Good morning, Your Honors. May it please the Court. My name is Ethan Ballo, and I represent Joseph Carrozza, Dr. Joseph Carrozza. This morning I'll speak for all three appellants, and I will address the first issue primarily, the evidentiary exclusion, denial of constitutional right issue. And at the end, I'm going to try to argue the fourth issue, the grand jury misconduct issue. I'm going to do my best to reserve two minutes. The district court violated the appellant's right to present a defense by excluding three critical pieces of evidence that showed each reasonably possessed a good faith belief that Dr. Joseph Carrozza could properly issue Schedule 3 and 4 prescriptions, or prescriptions for Schedule 3 and 4 drugs, based on his assessments of online medical questionnaires. The three pieces of evidence are important to understand. The first was they proffered and sought to introduce the live testimony of the DEA administrator that the Controlled Substances Act and its implementing regulations under Title 21 of the CFR did not require in-person examinations as a prerequisite for a valid prescription until 2009, when the Ryan Haight Act was passed. The second piece was that was the executive piece. They offered corroboration from the legislative piece. The Congressional Research Service, which is a legislative arm of the Library of Congress that writes reports for Congress to identify and assess gaps in law or need for legislation, wrote a report making a legislative finding that the Ryan Haight Act was, in fact, needed to close what the DEA, what Rana Saizy was urging, that there was a gap in the law that the CSA and the implementing regulations did not also require an in-person examination as a prerequisite that online medical questionnaires were sufficient for prescriptions to be issued by a bona fide doctor. Well, now, at the trial, just remind me, your client did not testify? He did not, Mr. Navarro. And the other two defendants did testify, correct? That is correct, Your Honor. So, and they talked about these things, did they not? They did talk about these things. Before I get to what their testimony was, I just want to identify the third piece, because they talked about Rana Saizy, what he had testified to, but Rana Saizy's congressional testimony was excluded and his live testimony was excluded. They were not allowed to talk about, they did not ever say what was in the congressional research report. So that was, as they say, right out. And the third piece of evidence that was excluded was the contents of it, the large portion of a declaratory relief action, paragraphs 16 to 25 were redacted by the district judge, and those were the portions of the declaratory relief action where the Mr. Caroz, Dr. Caroz and Mr. Napoli and others who were part of the trade group that filed the action identified Rana Saizy's testimony and the gap in the law and current enforcement by DEA, despite the fact that Ryan Haight had not passed, and they sought a declaration from the district court of the Eastern District of Pennsylvania saying, in essence, allow SafeScripts Online to continue in operation unless and until Ryan Haight passes. But didn't Judge Breyer tell you that the, that if the defendants testified that they could refer to the Rana Saizy testimony? Yes, he said that. And they did refer to it. And so they did refer, but your client didn't testify. No. So why does he have even standing to complain here? Oh, well, he has standing to complain because Napoli and Green testified that they met with Mr. Caroz, and they discussed with Mr. Caroz both Rana Saizy's testimony, and they said they spoke with him. If he's allowed them to testify, if he's allowed defendants to come in and say, hey, you know, in the middle of this, we were concerned about whether we were legal, and so we were monitoring things very closely. And one of the things that we monitored was testimony before Congress and anything that DEA did. Right. And we listened and we read with great interest the Rana Saizy testimony, and particularly where Mr. Rana Saizy said that there's no statutory definition of Dr. Client. Right. And the jury heard that from both Mr. Napoli and Joe Green, that my client was present for those conversations. So the jury's – So what would the original Rana Saizy testimony, what would the written document have done for your clients? Well, his live testimony and the CRS report would have given what this on-bank court in James said was corroboration in three critical ways. The government's case was built on basically a post-Ryan hate world. They introduced two experts that said it was a per se violation to issue a prescription based on an online medical questionnaire. Both experts, Katazon and McCance-Katz, said you require an in-person examination even before Ryan hate. The second piece, the sort of leg of their stool which they hammered was, during this period of 2005 and 2006, the one year Dr. Caroz was issuing prescriptions, the DEA was closing internet pharmacies and brick-and-mortar pharmacies. I'll be very precise about what I'm interested in. So what would it have given us? It would have corroborated, one, it would have shown the sincerity of their – the reasonableness of their beliefs, which is it's one – What do you get out of Rana Saizy? I read Rana Saizy's testimony. Right. And Rana Saizy, the only thing that you can point to I think is his statement towards the end of his written statement that there's no statutory definition. But the rest of it looks like it's really quite damaging to your clients. There's definitely – it's a mixed bag. It wasn't just a mixed bag. It's run in the other direction. He says this is illegal and that's our view that this is illegal. And then later on he just says one of the troubles is we don't have a fixed statutory definition of this relationship. He establishes it's not a per se violation. And the other piece his testimony establishes is that their enforcement protocol at that time was their concern wasn't safe scripts online. Their concern was hydrocodone and Schedule II substances, things that Joe Carrozza never prescribed. And so a doctor – it would have set up for the jury that a doctor could have a reasonable belief that – which is fundamentally what he did based on BMI assessments, which he absolutely completed, was reasonable. And doctors may disagree about that, but it was legal and he could make that assessment. And when you have two experts say he couldn't make that assessment and told the jury he couldn't make that assessment, the defendants had the opportunity to use Rana Saizy and the congressional research report to say he absolutely could. And even the executive in Congress conceded that he could. They want to close it. They want to make it per se, but it wasn't per se yet. What do we do with the CRS report? This is – I mean, this is a report. CRS is a very, very fine office. But, I mean, what if we'd had a law review article by somebody? Would we have introduced that to say, well, there's ambiguity here because some law professor thought that there was some gaps in the law? Well, if they relied on it, they'd be allowed to. First of all, you wouldn't have a hearsay – you'd have a hearsay problem potentially with a law review article. It's not a public records exception. But actually, under James, they probably could come in because James says, when – you know, the James Zeon Bank case, when a defendant says, I act in self-defense, even though she had to review documents that corroborated, a defendant gets the right to corroborate it. So in this case, it would be the state of mind that makes it come in, even if it was a law review article. Well, but what evidence did it – but Dr. Carozzi didn't testify, correct? Correct. So what evidence is there in the record? Because the issue is really that he believed in good – whether he believed in good faith that his actions were for legitimate medical purposes and within usual medical practices. Yes. So the evidence of his good faith is, one, that Napoli and Green testified that he attended the meetings. Two, that there was 8,522 rejections, including for reasons as in BMI isn't correct, the individual needs to have an examination, the individual is pregnant and is contraindicated for her other prescriptions, has a potential for abuse. This is a – this is basically the entire volume of the excerpts of record. Volume three is all of the charts of his – of his rejections. So what more would the – but I guess what more would the whole report have added in that there were negative – that you can't then just – you wouldn't be able to – if you entered the report, you'd have to put the whole report in and there was a lot of damaging things in the report. Well, I don't think the – I think Judge Breyer was talking to Dr. Ronestizzi's testimony. I think the report – there's not a lot of damaging things in the report. And it's not a – it's not a – But you're also objecting that Ronestizzi's evidence didn't come in, correct? Right. But we wanted it all in. I don't think it's a fair – I don't think it's fair to exclude it and say if it was included, you would have been unhappy. We wanted it in. We wanted the congressional report, and it would have had the rebuttal of two things. One, the expert testimony that it is a per se violation. And it provided the reasonable explanation for the jury as to why, despite all these closures, why didn't we shut down? Well, I guess – but I guess – I mean, Judge Breyer obviously has the right to make the trial about what it's about. And part of the purpose in having evidentiary hearings is you don't have to have a trial within a trial. I mean, and so he obviously made the determination that they could talk about these things, but he wasn't going to put the whole part of it in. Right. And that violated James, because James says we're entitled to the corroboration. You can't just have the testimony. The en banc court in James says if you're allowed to support it with evidence. And can I give – I can give two quotes, if I could, quickly. One is the quote from James, which is, The law of the circuit is crystal clear that corroboration of a key prosecution witness by the introduction of criminal records is permissible even at the risk of some prejudice to the defendant on trial. We should not have one rule for the prosecution and another rule for the defense. We were entitled to corroborate and prove to the jury it just wasn't Napoli's father talking, it just wasn't Joe Green talking, it just wasn't the defendant Napoli talking, that in real time they had documents that showed this belief was reasonable and the two experts that said it was unreasonable, they could be rejected because we had a DEA administrator and Congress saying we were right about the state of the law. But, counsel, did the government ever argue or introduce any evidence that in fact the DEA administrator really didn't say that or that the CRS report didn't say that? The CRS report, the jury didn't hear anything about it. Okay. Fair enough. So that's right out. So the D – but let's talk about the D, the DEA administrator's testimony. Was there any testimony from the government saying – for example, in rebuttal or in cross-examination to say, no, he really didn't say those things, the administrator? I don't believe so, but I'll reserve my two minutes. Sure. I'll come back to that question if I may, Judge Owens. Sure. Thank you. Good job. You stuck to it. That's the first time I've seen someone do that. I think you dropped something. Thank you. May it please the Court. I'm Karen Landau. I represent Chris Napoli, and I'll try to also reserve two minutes for rebuttal. So the fundamental – so my mission for my seven minutes is to talk about the flaws in the jury instruction in good faith. And I think the – where we and the government fundamentally differ is that in our view, when a conviction for violating the Controlled Substances Act is based on a violation of the CFR, what we have is a species of specific intent. And in this case, the judge's instruction on good faith was inadequate because it failed to recognize the identity in this particular case of a defendant's belief in legality and a defendant's belief that prescriptions were issued in the usual course of professional practice and for a legitimate medical reason. And the problem – the first problem I'd like to address is the good faith – the portion of the good faith instruction where the judge – which is really the last two sentences – where the judge says that evidence that a defendant believed his conduct was legal is not standing alone in defense. And then – Well, why is that wrong? Well, the reason that's a problem is – well, it is – first of all, if – It seems like it's right. You can't just say, well, I didn't think I was doing anything wrong, and therefore, I'm not guilty. That's true. But in this case, the defendant's belief in legality was so intertwined with the question of usual professional practice. And that instruction let the government contend that – and in fact, they did contend – that all of the evidence that my client and that Mr. Johnson believed that their And the instruction so limited the concept of good faith that there was – that, you know, the government was allowed to do that. Now, it's particularly difficult because here the concepts of usual course of professional practice and legitimate medical reason are what I would call terms of art. They're something that lay people are not going to understand. They're something that medical professionals are expected to understand. But what lay people do when they're starting a business and they're worried about what can they do, what can they not do, is they go talk to a lawyer. And that's exactly what happened here. And the question is, you know, to instruct the jury in this – in this way that one cannot consider their belief in – essentially, the Court said, look, you know, whether they believed it illegal is completely irrelevant, and that's what the government argued. Okay. So is your – is your argument that the – that the judge gave instructions that were wrong or that he omitted instructions that he should have given? I would say he gave instructions that were wrong, and if – Okay. Which instruction did he give that's wrong? I'm – I'm – The last two sentences, which I just previously mentioned. Okay. The standing alone defense. The standing alone defense. You know, if he had – if he had omitted that instruction, it would have been fine. I would also point out that since he gave that instruction, he had the obligation to then instruct on the – I mean, the problem is, is the – the secondary problem, and I'm just going to turn to that briefly, is that this case was about the state of the law at the time. And he did not give an instruction on the Ryan-Haidt Act. The judge said, well, I'm not going to comment on a particular piece of evidence. But that particular piece of evidence was critical because the government – one of the government's theories of guilt was that, per se, the conduct was illegal because there was no face-to-face examination, and that it was per se illegal to prescribe based on an online questionnaire. And, of course, as Mr. Bailaw pointed out, the – Bailow, excuse me – pointed out the – there was testimony to that effect. There was expert testimony that if you don't have a face-to-face examination, it's per se illegal. But, in fact, there was – and, again, the evidence on this did not come in fully. There was a law pending at the time, that Congress – the Ryan-Haidt Act, that ultimately requires a – now requires a face-to-face examination. Kagan. But why isn't – but the Eighth Circuit in Beerbrower, I guess? Yes. Beerbrower, yes. Whatever, however you say that. Yeah. So that is the Eighth Circuit. But it seems – but what they say is the fact that the Senate has passed a bill which would amend the CSA to explicitly prohibit the conduct at issue in this case does not invalidate the government's prosecution of defendants under the existing provisions of the CSA. So why shouldn't we just follow that? Well, we're not arguing that it invalidates the prosecution. What we're arguing is that it's part of the good faith. First of all, in this circuit, Feingold is a bit different than the law in the Eighth Circuit and the Eleventh Circuit. Feingold talks about what is essentially a form of specific intent. And we are not arguing that the prosecution is invalid. We're not arguing that the statute was too ambiguous to permit prosecution. What we are arguing is that the jury should have been instructed on the pendency of the Ryan Hate Act so that it could adequately consider whether the pendency of a law is enough to render the defendant's actions or the possibility, at least, that the defendant's actions were taken in good faith, because there was confusion as to the law and there was ambiguity. And the question is, what did the defendants believe in good faith? So are you saying the way the jury was instructed, there was no avenue for the jury to find good faith on the part of your client? I'm going to ask the prosecution that, and I know they're going to have some other answer, but. Yeah, I think that's right, actually. I guess I would say, I would refine my answer. I would say that they couldn't find good faith given the testimony and the evidence because my client, as a layperson, naturally focused on the legality of his conduct and he went to lawyers. And I think the same is true for D.J. Johnson. Maybe the question is a little bit different as to Dr. Carrozza, but I do think that that's right. They couldn't find good faith because, plus, there's an argument, there's, the government had an invalid theory, a legally invalid theory for conviction because they argued that the mere fact of the lack of an in-person examination was, showed per se a lack of good faith. In other words, they argued that, hey, look, there was no in-person examination. That's it. But didn't they also argue that the number of prescriptions they were doing a day, that they never even verified that the person was, in fact, the same for all sorts of things? Well, they made a lot of arguments. Yes, they did. They argued that, but they were alternative theories. And I would add that the defense presented a lot of evidence that that wasn't the case. I mean, there was a, this was not a case where there was no defense. There was a real defense. There was significant cross-examination showing that the government's, I'm running out of time, that the government's figures were wrong, that the statistical analysis performed by the government was wrong. There was. You can save it if you want. All right. I will. Thank you very much, Your Honor. I think I know where you're coming from. Thanks. Good morning, Your Honors, and may it please the Court. My name is Martin Cibeli. I represent Daniel D.J. Johnson. I also represented him in the District Court. And I would also like to reserve two minutes, please. I'd like to focus on the last question that the Court posed to my colleague, Ms. Landau. I think that's the key question. And I would answer it, as Ms. Landau did, in, with a slightly different formulation. And that is the following, that Judge Breyer's standing alone instruction, as the Court has characterized it, coupled with his refusal to give a reliance by non-practitioners on practitioners, those two errors singly and together effectively reduced the government's burden to the point that our clients could be convicted on general intent when fine gold, very specifically in this circuit, when fine gold requires specific intent and even willfulness. And I would point out that the government's brief relies very, very heavily on an Eleventh Circuit case called Tobin. And even Tobin recognizes that under 846, a conviction under 846 requires willfulness. The government focuses on the, simply on the possession with intent to distribute part of it. But there's no question that even under the government's principal case, the Eleventh Circuit case Tobin, the conspiracy instruction in this case was absolutely wrong, that willfulness was a requirement and that Judge Breyer didn't give that, because Judge Breyer excluded completely a defense that my client and Mr. Napoli and Dr. Carrozza had to violate a known legal duty. Judge Breyer, yes. I have a question on the conspiracy to launder money. Yes, Your Honor. Are you challenging that? Because I can't find where in your briefs you're challenging that. Yes, I think we did, Your Honor. I would have to look at my brief to, to, to. I see where you're challenging the three convictions, all three convictions or the drug convictions, but I don't see specifically where you. I'm not sure where the specific sentence is, but the. Maybe you can just do that and tell me in rebuttal where it is. Yes, Your Honor. The money laundering conviction, of course, depends upon the other convictions. And so on the conspiracy or the intent to distribute. So I, I would say that the, that conviction cannot rest without the validity of the, of the intent to distribute or the conspiracy with intent to distribute. And, and I, I, I mentioned a few moments ago both the intent to distribute and the conspiracy, but aid or in a better liability also requires specific intent. And so it's, it, I would submit to this Court that those two instructions, the standing alone instruction and the refusal to give Mr. Johnson, Mr. Napoli, a reliance instruction effectively imposed on these two and also to certain, and also on Dr. Carozza, but in a different way, an affirmative duty, an affirmative duty to investigate the law and to get it right. And that comes very, very close to strict liability for two non-practitioners, two lay people like Mr. Johnson and Mr. Napoli. What the Court did was effectively to require them to investigate the, the practices of a doctor and to get it right. Well, the Court just did, the Court, it wasn't that you couldn't rely on a pharmacist or legal, but that wasn't the end all, be all. Just because you went to a lawyer, it wasn't, I mean, they could show that they talked to lawyers, right? Yes. So what they would have liked to have said, well, they talked to lawyers, that therefore that's the end. I mean, lawyers can be crackpots like anyone else. Sure. And so you can find a lawyer to tell you anything. Sure. But I'm not just focusing on the lawyers. I'm specifically also focusing on the fact that there was a doctor writing prescriptions. And that's, that's the key to Feingold, which takes Feingold outside of the garden variety street drug scenario into a prescription writing scenario where there's a heightened burden. That's the key finding in Feingold. And what I'm saying is that here where you've got two lay people, like Mr. Johnson and Mr. Napoli, who are working with a doctor who's writing prescriptions, Mr. Napoli and Mr. Johnson don't have the medical knowledge or training to investigate the doctor or supervise the doctor, and they shouldn't be doing that, nor do they legally have access to patient information. So to a certain extent, they must legally rely upon the judgment of a doctor. And the CFR — Well, you know, they're not down in the weeds looking at, second-guessing whether he properly denied a prescription or gave a prescription. But they are certainly the ones who set up the overall structure of this, and then went looking for a doctor that would, that could prescribe, that was capable of prescribing, you know, hundreds and maybe even thousands of prescriptions a day. That wasn't on the advice of Dr. Carrozza. They already had that well in place when they went and found Dr. Carrozza. Your Honor, first I'd like to — there are many distinctions between Mr. Napoli and Mr. Johnson in terms of their role. When they became involved, who set up the SSO, the SafeScripts online venture, and the degree to which — But doesn't Mr. Napoli say at some point, like, yeah, I'm making too much money to stop this? Is he the one that says that, or is that your client? My client definitely doesn't say anything like that, Your Honor. Not at all. In fact, my client made very little money. Internet Commerce Corp, which was his father's business in Pekin, Illinois, is a subsidiary of his father's main business, and they're a tax business. That whole tax business made about $800,000. Mr. Johnson, in this two-year period, personally and with his wife, made about $200,000. So my client over — and that's over a two-year period during which his wife quit another job and got a salary from this instead of her other salary. So Mr. Johnson, you know, he's got a — I think a 1990 Toyota pickup truck, and he lives in a small house. He made about $200,000 total. He was not making money hand over fist on this. And he's very different from what the Court might be thinking. But Justice Bybee's question is essentially, aren't — shouldn't we really take the 50,000-foot view? My client isn't charged with overseeing particular prescriptions. Rather, he is being faulted here for the overall picture. I understand that. And that's a fair — that would be a fair prosecution theory. The problem is there's also a fair defense theory, which is that he shouldn't be held strictly liable. He does not have a duty to investigate and to get it right. And moreover, he is entitled to rely on the good faith of a doctor. So if he was — had he been convicted with those instructions, that's a different deal. But what Judge Breyer did was to make this come very close to strict liability, and when Feingold creates a very different standard. Your Honor, unless there's a question now, I'd like to reserve my last two minutes, please. Let me do so. Thank you, counsel. Thank you. Thank you. Good morning. May it please the Court. My name is Lori Gray. I represent the United States. None of defendants' claims have merit. And as a result, this Court should affirm each of defendants' convictions. I will start with their claim that the district court did not — that the district court deprived defendants of their good faith defense. And before I discuss how the record refutes that, it's important to clarify that below, before the district court, who had to rule on this evidence, the defendants offered it for a different theory, not that they in good faith believed that prescriptions were being issued in the normal course of medical practice and for a legitimate medical purpose, but instead to challenge the statute and their defense that the CSA did not apply to them. And that's important because their theory from opening statement through closing argument was that the government did not have the power to regulate their conduct, and that's apparent in the declaratory judgment that they filed at J.E.R. 321, defendants' joint excerpts of record. That's where that declaratory judgment is. And that judgment says the plaintiffs seek a declaratory judgment that the CSA provides no authority for the defendants, that is, the U.S. Government, to declare as a matter of Federal law the steps necessary to create a legitimate doctor-patient. Did they press this argument, not the argument for admission of the declaratory judgment, but did they press this argument that the CSA didn't apply to them if they couldn't be convicted under the statute? Did they press that in their brief? By citing Cheeks. I mean, the only reason to cite those cases is that they're not. Roberts. Cheeks is different. That goes to what burden the government has to show intent. Right. That doesn't mean that you can't be convicted. But to say that you – there's one thing to say I've got a defense to a lawful act. There's no thing to say the act doesn't apply to me from the beginning. You can tell it doesn't, and you have no – and you go to a motion to dismiss and try and get the whole thing thrown out. Now, did they make that motion? They did. And throughout, that was their contention, Your Honors, is that the law didn't apply to them and that they sort of found this wrinkle that they were willing to be outside the scope of medical practice because the law didn't apply to them. And the government, to make the record clear, did not ever say that this was a per se violation to not have a face-to-face. It was not a single liability theory of prosecution. And the indictment makes that clear. The indictment at the joint excerpt of Record 331, Paragraph 3, describes the conspiracy in this case. And it says, At no time during the questionnaire review process did Defendant Carozza or any other approving physician physically examine or obtain a complete medical history or make any effort to confirm the accuracy of the information provided. So the court was ruling on this with them attacking the statute and saying the defense that they didn't think they violated the statute. But as Your Honors know, under Feingold, they were entitled to a good-faith defense which they presented that they did if they did not think that the prescriptions were being issued outside the scope of medical practice. It seems that the things that the court left out were relevant. And so I just, I mean, you can make, you could make a harmless error argument, but it seems that if they wanted to get them in, what exactly would the testimony of the DEA administrator, the congressional report, and I guess portions of the civil complaint, it seems that they were relevant. So what, are you just saying that they were kept out on a whole different ground than what they're arguing now, or? Well, if I can unpack that a little, Your Honor. Okay. They were not relevant to whether or not they thought they were violating the statute. But I understand if the court says, well, wait a minute, they were relevant to the proper purpose, the court ruled them inadmissible on hearsay grounds specifically with regard to the declaratory judgment, that it was just rife with self-serving statements. And some of it came in, though, right? They testified about that. And I will get to that under the harmless error as well, Your Honor. But, and with regard to the congressional research report, same thing. It was hearsay. And I want to correct one comment made by Mr. Ballot. Napoli did, to your point, Your Honor, did testify about this at supplemental excerpt of record 1340. He's asked, and did you discuss with Green, his attorney, a congressional research service report, and it's marked for identification as Exhibit 3052, and then on SCR 1341, the question's asked, Mr. Napoli, could you look at the last page of that document? What did you discuss with Mr. Carrozza about the congressional research service report? And at 1342, Mr. Napoli says, my recollection is that we spoke about the lack of a requirement, Federal statute required, or lack of the requirement of a face-to-face model for a doctor. And the question's asked, and that was particularly, excuse me, partially based on this research report. And he says, yes, it was. The other thing to note, Your Honor, is they were asking that pieces go in. So they marked the report, but it didn't, the report didn't come in. The Court ruled that it was inadmissible hearsay. It also lacked trustworthiness. And with regard to the declaratory judgment, the Court found those were self-serving statements. But the defendants were far from prevented from putting in their good faith defense. The record shows that, as I just showed, Mr. Napoli testified about his understanding of Ranazzisi's testimony, about the CSR report, about the Ryan Hate Act and his civil complaint for declaratory relief. Mr. Johnson testified about his understanding of the Ryan Hate Act and declaratory relief. And they did get corroboration. They had corroborated. Kagan. But what about the DEA administrator? Did they have that person under subpoena or not? They filed a subpoena for him. The government filed a motion to quash based on the fact that, first of all, Mr. Napoli has a lot of congressional knowledge of this case and he is a high-level government employee. And as I believe Judge Bybee pointed out, again, they were trying to put in a portion and, frankly, Mr. Ranazzisi would have been great for the United States because he flat-out said the full context of the congressional testimony states, and this is in the defendant's excerpts, that while Ranazzisi testified, quote, there exists no statutory definition specifically outlining what constitutes a valid doctor-patient relationship, he also testified this does not mean that Internet drug traffickers can operate freely. And we know that from Feingold. He testified that the drug trafficking schemes involving a doctor's approval of controlled substances orders based solely on the review of an online questionnaire are illegal. But the government, again, showed multiple reasons why the defendants in this case were not acting in good faith. And to your point, Judge Callahan, each defendant testified, but they got corroboration. They called a doctor. They called Dr. Wilkins, who testified and said that he believed he was acting in good faith. Two attorneys testified. Green testified about his discussions with Mr. Napoli about Ranazzisi's testimony, about the Ryan Hate Act, about the declaratory judgment. Mr. Napoli's father, Andrew, was an attorney. He testified and said that in his opinion, his son's business was legal. The Court gave the precise instruction that this Court mandated in Feingold. So what is your best argument? What is your best argument as the basis for the Court denying, admitting those reports? Well, again, Your Honor, for what they offered it for below is irrelevant to whether or not they thought that they were violating the statute. With regard to the proper basis under Feingold, the declaratory judgment was inadmissible here, say it was self-serving. It was untrustworthy because it was filed after defendant received a target letter saying that his conduct was under investigation. The Court, because there were multiple iterations of the declaratory judgment filed, said this was going to cause him to embark on, I think his quote was, I'm many The most confusing, contentious, incomplete, and time-consuming exercise it could imagine, because in the first declaratory judgment was filed, defendants lied. They said that they wanted a ruling on a prospective business. They did not say, hey, we're doing this now, and we've been doing it for two years. And so that was why that was excluded. The congressional service was based on, as I said here, say, the Ryan Hate Act did not have any relevance to the particular charges and nor the testimony of Ranazino Susi. They got that in by testifying to it, Your Honor. And if the Court were to find that there was the district court abused its discretion, I would go to the harmless error argument and say that in this case, overwhelming evidence established that the defendants did not act in good faith. And as far as their intent, Judge Bybee, under Feingold, they did they were instructed that the jury had to find the mens rea, that they knowingly and intentionally knew that these prescriptions were being issued outside the normal course. These defendants – I'd like you to turn to the instructions with me. So I am – let's see, let me find where those were. So I'm looking at the paragraph that has the standing alone question. And I think it was Ms. Landau who characterized the statute as a specific intent statute. Does the government disagree with that characterization? I don't think it's a specific intent statute, Your Honor. What Feingold says – Do you think that it is or is not? It is not. But what the government had to prove under Feingold was that the defendants acted knowingly, intentionally. So not by – What makes the – what would be the government – Not with a bad purpose. I would say willfully. It doesn't have the word willfully. But Feingold did graft on an extra component that the Court instructed in this case. Feingold's the template. And the Court instructed with Feingold. And the jury was specifically told that they had to find – this is at the excerpts of record, appellate's excerpt of record 179, Your Honor. The statute uses the phrase knowingly or intentionally. Correct. Correct. And that – And in Feingold, we found that that takes it beyond a general intent statute. And that was what was instructed in this case. Is the government's distinction between a specific intent statute and what we found in Feingold, that they – that the defendants – the government didn't have to prove that they knew that they were violating the law, only that they were violating Right. Only that the doctor did not have an appropriate relationship with them? Right. Okay. So that's a pretty minor distinction. It is, Your Honor, but it is a distinction. And the jury was instructed, as I said, consistent with this Court's directive and told that the defendant knew and intended that the delivery be made by means of a prescription issued not for a legitimate medical purpose and not in the course of professional practice. And the Court instructed on good faith. The defendants got exactly the good faith instruction that they asked for. This is at 182 to 183 in the joint excerpt of record. It says the judge told the jurors. The defendants in this case maintained that at all times their actions were done with a good faith belief that the controlled substances were being distributed by means of a prescription issued by a physician for a legitimate medical purpose and in the usual course of professional practice. That's fine gold. The Court goes on to say good faith means an honest belief that the physicians issued the prescriptions for a patient's condition in accordance with the standard of medical practice generally recognized in the country. And this is another fact clarification. The experts that testify did not say this was a per se violation. Again, it wasn't a single theory prosecution. The experts went through and said here's all the problems in this case is that there was no verification of the information the customers were providing, and the customers testified they lied. One customer came and said, well, a female, I signed in as an overweight male, and I had previously ordered drugs, so I used my ex-husband's credit card. And so the experts went through and said there was no way to verify, there was no records, there was no lab report, there was no follow-up to make sure that the medications were being used for the proper purpose and not being abused. So the Court instructs good faith means an honest belief that the physicians issued the prescription for a patient's condition in accordance with the standard of medical practice recognized in the country. In other words, the government must prove that the defendants did not have an honest belief that prescriptions were issued by a physician for a legitimate medical purpose and in the usual course of medical practice. The burden is on the government to prove that a reasonable doubt, beyond a reasonable doubt that the defendants did not act in good faith, unless you find beyond a reasonable doubt that the conduct charged against the defendants was not done in good faith, you must find the defendant not guilty of these charges. So they were specific. Kagan. So are you in agreement with the Burr-Brower case in terms of that, is that how you argued it? You didn't say per se. Right. We never said per se, Your Honor. Well, what were the, what was the other evidence, since you've said it was overwhelming, what was the other evidence that the jury heard in terms of that would have Certainly. Presented problems for good faith? I mean, I know some pharmacies were shut down. I, I, they, someone said, and I thought it was Napoli, that I'm making too much money. He did say that at the beginning when his partner, if you remember, Your Honor, Mr. Mullen dropped out when the first, when the first pharmacy was closed down. And that's when Napoli made that statement. But I'll start, Your Honor, with the sheer volume. During a one-year period, SafeScripts processed 149,000 orders, which was 15 million pills. The defendants' internet pharmacy shipped over 15 million pills, and Dr. Carozza approved a staggering number of prescriptions. I would direct the Court's attention to SCR 1618, which is Government Exhibit 20B, which was introduced at trial. That shows that Carozza approved hundreds and hundreds and hundreds of prescriptions each day of the week, Monday through Sunday. He prescribed to people that he'd never met, that he'd never talked to, that he'd never examined, while he sat waiting for his car to be repaired. It was like he was filling shoe orders from Zappos, Your Honor. That's a starting point for good faith. I don't think Zappos can fill shoe orders that quickly. I don't think they would either, Your Honor. And Napoli and Johnson aided and abetted this distribution of controlled substances, acting knowingly and intentionally, as the jury was instructed they had to find. And they knew that the doctor was not prescribing in the usual course of medical practice and with a legitimate medical purpose, because they were the ones who had created the questionnaire that did not ask what medical condition was being treated, did not ask for medical records, did not allow for lab work, did not allow for follow-up. Is there any evidence that Dr. Carozza was not approving these all himself, that he didn't view some of the prescriptions, that he was using somebody else to do that? At one point I believe he says to the DH, and I didn't think I was practicing medicine, and I think at one point he said when he got too backlogged, he allowed others to do it. And in a Skype exchange that came in at trial, Your Honor, Napoli asked Johnson to go in, log in as the doctor. We know he had back-end access to go in as the doctor and take care of some of the backload. This was a six-week trial, and the jury deliberated for less than a day. They simply rejected out of hand this good-faith defense. Counsel, can I ask you a couple hypotheticals so I can understand the government's reading of the case law? Sure. All right. So the first hypothetical is I'm a pharmacist at the CVS right across the street from the court. And a gentleman walks in, and the gentleman walks in, and he looks, this is from my prosecutor days, he looks kind of like a tweaker, okay? And he has a prescription, and I look at the prescription, and it says it's from Dr. Carrozza. And so I call up Dr. Carrozza, and Dr. Carrozza says, yep, I prescribed it to him. You know what? I didn't actually see him in person. I was getting my car repaired, and I kind of got on the Internet, and I gave him the okay to take this scheduled drug. So I'm the pharmacist, and I'm concerned because this seems to be outside the normal medical practice, and I'm wondering if it's for a legitimate purpose. And so I look in the pharmacy manual, and in the pharmacy manual it says, if this scenario occurs, call CVS Legal. So I pick up the phone, and I call CVS Legal, and I tell them what happened. And CVS Legal tells me, yeah, you know what? I used to work for the DEA, and, you know, this is a gray area in the law. I think it's fine. So as CVS Legal, I'm telling you, go ahead and dispense this medicine to the tweaker. So I say, look, it seems weird to me. It seems like it's outside the medical purpose, and, you know, I don't think this is really a legitimate thing, but Legal is telling me it's okay. So I go ahead as the pharmacist, and I give the medicine to the tweaker, or the controlled substance to the tweaker. Under your theory, am I guilty? Well, I mean, first of all, that's a one-off. Yes. As Your Honor knows. And we had a pharmacist testify during the trial, you may recall, Mr. Catazon, who testified that pharmacists, in fact, have a duty, just as you represented in your thing, that if, for example, you know, it's a child's prescription and it's an adult dosage, that would cause a bell to go off that I need to contact the doctor. Or if, you know, antibiotics typically run a course of 10 days, and here's a list of antibiotics that's given for 3 months, that might cause a red flag to go off. In this instance, a red flag was raised when the pharmacist had issues. And I think in that one instance, I don't think that, you know, you've got the legal opinion that they said that this was different. It wasn't the doctor saying that he was acting within the scope. The doctor said I didn't examine him, I didn't do my job, I wasn't practicing medicine. I think that's markedly different. So in my situation where I believe as the pharmacist that the medicine was not properly prescribed, it was outside the course of usual medical care, but legal is telling me it's okay, I would assume under your theory that I could still be prosecuted. Well, I guess what you're saying is you're raising a good faith defense, Your Honor. Isn't the good faith subjective, though? So if still, as the pharmacist, if you think it's wrong, do you have a good faith? And the good faith has to be reasonable. It has to be reasonable. It can't be crazy that it's wrong. No, I don't think that's true. I think, Counsel, a good faith belief can be unreasonable. You can judge whether it's a true good faith belief on the reasonableness of the belief. That's what the Cheek case tells us. Right, right. You're correct, Your Honor. So, again, I'm just trying to get to that hypothetical. I, as I understand your theory in the case, I could be prosecuted because you've been. Because it's outside. It is outside what Feingold says. You're right. Feingold makes very clear, makes clear, that's the template, is that if it's outside the normal course. And the one thing I want to point out is the judge actually instructed, Feingold says, simply put, to convict a practitioner under 841A, and this is at Penn Site 1008, the government must prove, one, that the practitioner distributed controlled substances, two, that the distribution of those controlled substances was outside the usual course of professional practice and without a legitimate medical purpose, which we were just talking about, Judge Owen, and three, that the practitioner acted with intent to distribute the drugs and with intent to distribute them outside the course of professional practice. But that's the practitioner. The pharmacist is not. No, but the aiding and embedding is how Mr. Johnson and Mr. Napoli came in, the aiding and embedding instruction. Feingold, interestingly, goes on. Admittedly, the instructions would have been clearer if they had stated that the government must prove beyond a reasonable doubt that the defendant intentionally prescribed or distributed the controlled substances other than for a legitimate medical purpose and not in the usual course of professional practice. Judge Breyer did just that. He added on the one part of Feingold that said, you know, based on, we don't think there was instructional error, and if there was, the evidence is overwhelming. But you know what would have made this a little better is if we had this language and Judge Breyer gave that language. The evidence, the evidence was overwhelming with that regard. Let me ask you a follow-up hypothetical. Let's say during this, before this case began, there was the Dr. Carrozza Act. And Congress passed the Dr. Carrozza Act, and it said it's okay to prescribe over the Internet. It's okay to prescribe without an in-person visit. Prescribing on questionnaires is okay. And that was the state of the law before Dr. Carrozza and his co-defendants began this operation. What would the result be then? Then I don't think that it could be prosecuted. I mean, you could still show that they were acting in bad faith. I mean, they're not willy-nilly allowed to hand out controlled substances. But if the law were different, but the key thing is the Controlled Substances Act doesn't change based on the status of the defendant. It outlaws the distribution of drugs where it's in violation of. Right, but I would think that the method of, let's say Congress did pass that Act and said it is legal to visit, to prescribe over the Internet without an in-person prescription. I would think you would still say, under your theory, that would still be illegal because it's not being prescribed for a medical purpose, for a legitimate medical purpose. You would still, I assume in your case, you would argue that, yes, you can prescribe over the Internet, but in this case, the Dr. Carrozza was not doing this for a legitimate medical purpose. Right. It has to satisfy the CFR that implements that part of the statute with regard to a practitioner, because as you know, as I just said, the statute prohibits the distribution of drugs completely, except with one carved-out exception. And that exception is a practitioner who is registered and who is following the CFR for those two prongs of within the scope of legitimate medical practice and for a medical purpose. Well, but they still could be faulted, even with the Dr. Carrozza Act, if they didn't verify who the people were. Right. And people could they, I mean, they might have a stronger case for good faith because that you wouldn't be able to argue, well, hey, they didn't even do a, you know, examination. Right. Because you were arguing they didn't do an examination as part of the totality of the circumstances. Besides everything else that they didn't do, they didn't do an examination  That's correct, Your Honor. That's correct. So it would be a weaker case, but arguably you could still prosecute it, right? For sure. For sure, Your Honor. And I wanted to address briefly the grand jury issue that's raised on appeal, because the record, again, this goes to the constant refrain from the defense that they were prosecuted for a per se violation. It was never a single theory of liability, and that's clear in the grand jury transcript. If I can direct, Your Honors, to SCR 17, that special agent Bridger's August 31st testimony, and the prosecutor asks, using the correct standard, what is the evidence that we have that Mr. Napoli intended for the distribution to be outside the scope of professional practice and not for a legitimate medical purpose? The agent testifies for the next seven pages at SCR 17 to 23 as to that evidence, and it is so much more than a face-to-face examination. He goes through that the DEA visited Dr. Oscar and Wilkins very early and said it was illegal, that the doctors told Napoli that, that pharmacies were shut down one after another, and that Napoli's way of dealing with that was to purchase his own pharmacy in a nominee name and tell Johnson, don't tell anyone that's ours. The Skype communication where he says, I want DEA off my back and the business to run another year. When Quick Pharmacy is closed, Mr. Napoli says to one of the witnesses, Robin Bloom, will you come visit me in jail? The target letter from the U.S. Attorney's office. Later in that transcript at SCR 26, the prosecutor ---- Sotomayor, but arguably, since, I mean, arguably, there have been cases where prosecutors have said something was a violation and later a court, like the U.S. Supreme Court, has said that the evidence was insufficient to show a violation. Right. So arguably, I mean, they could say that it was a developing area still. Well, and we cite in our case the whole section on going back, I think it's 1972, Your Honor. Well, is your backstop on this that even if that did happen at the grand jury, that it didn't happen at the jury trial, and therefore, then when you're convicted under the ---- Yes. Well, the point I was trying to make, Your Honor, and under mechanic, they disagree, but we believe that nonetheless, should the court find that there was there, that it was ---- it is harmless, because if you view the entire grand jury testimony, and that's what I was trying to point out, that this was a very small part, what they pull out of context from the record, and that, in fact, it's not a situation where the government presented only false testimony and the grand jury indicted. Instead, the record shows that the government presented abundant testimony to show that the defendants failed to act under the proper standard. But if the ---- but if the ---- when they actually had the jury trial and that wasn't the case that happened at the jury trial, does that ---- is there any case that says that that doesn't cure it? I don't believe so, Your Honor. And we cite, and I can't remember off the top of my head, the cases that would cure it. And that the Petit jury's decision cures any error before the grand jury. I don't know if the Court has any more questions. If you do, I'm happy to respond. Otherwise, I would submit on the briefs and the argument today and ask the Court to affirm the convictions on all three defendants. Thank you very much, Ms. Gray. Thank you. Thank you, counsel. All right, counsel, you managed to ---- you did it. Well, we'll see. I have a lot to cover, so let me get going. First, my colleague says that we make the argument in our opening brief that we made it at the jury trial, that the CSA did not apply to our conduct, that we made a cheek argument, the government can't do this. That is not true. They even said that in their brief, their quote is, defendants contend that before the passage of the Ryan Hate Act, the CSA did not prohibit their conduct, C-A-O-B, 37 to 40. This argument fails for four reasons. Our next ---- the government's brief at 47. Our next sentence is, appellants do not make this argument. We never made that argument. The government cites to the declaratory relief action to say we made that argument. This is the last paragraph that was excised from the jury's consideration. This is paragraph 25. There remains pending before Congress an Internet Pharmacy Consumer Protection Act, H.R. 840, that would impose a face-to-face meeting requirement for the prescription of pharmaceuticals. It is improper for defendants to claim the authority to impose such a requirement before Congress has passed this act and spoken on the issue. This case does involve Sheik in both ways, but not the second way that the defendant and Sheik said the laws don't apply to him. The defendant's argument was, until Ryan Haidt became effective, Congress had not acted and the CSA did not have a per se requirement, which leads me to my second point to rebut the government. They say did not make a per se case. Catazon and McCance-Katz, the fundamental argument, their testimony was, there is no doctor-patient relationship without a face-to-face meeting. Without a doctor-patient relationship, you can't prescribe drugs under the CSA. That was their closing argument. Three, relating to Judge Owen's question, you said, did they ever say Ronacisi didn't say that. No, but they did call all the people who testified either liars, they called Mr. Napoli a liar, or they called his father's and his attorney's testimony self-serving, which is why we required corroboration. Four, Ms. Gray says Judge Breyer excluded the CRS based on hearsay. That is not true. He did not exclude it based on hearsay. He never made such a statement ever on any point in time. He didn't ever say a basis for excluding it, and it's not hearsay. It's a public records exception, and it's completely admissible. Five, the court, Judge Owen, did you ask me, and I think Judge Callahan did too, for evidence of good faith. In addition to all the denials, which specifically show what was contraindicated when it's a VMI violation, the evidence of good faith was that they sued to keep SSO open notoriously. That Dr. Carozza was referred to by Napoli, Bloom, and Johnson as doctor denied. They mocked him. They sent angry e-mails, or he sent angry e-mails, this is ER 21 to 23, complaining about they're not updating the website. They have to update the blacklist. They need to add a new medical field for requesting ordering medication. That this is the evidence, in addition to almost 9,000 denials, that shows that Dr. Carozza was exercising medical judgment. I think it was Judge Callahan asked a question of my colleague. She didn't answer it. Was there evidence in the record that, or it was Judge Bybee, I'm sorry, Your Honor. Was there evidence in the record that Judge Carozza did not issue all of these? He testified, or he gave his interview to the DEA, said 3 to 400 a day, which if you calculate it comes to about 90,000, and so he denied almost 10 percent under that kind of math. The evidence, you can find it all cited in footnote 10 of the AOB, but in essence, Robin Bloom, the government's main cooperator, testified. There was evidence that she had back-end accidents and was directed to approve prescriptions for others. The AFPOWER, 20,000, I think 24,000 that were approved in some crazy short period, the evidence was for Dr. Carozza to have approved those. He would have had to have just been clicking yes every six seconds for 24 hours without a bathroom break or sleep. It's impossible, which suggests that he didn't do that, that that was approved by anybody else. The ultimate testimony of the agents was there was no way to know what he specifically approved. His names were on the bottles. My colleague suggested that he authorized someone else to approve prescriptions for him. That's not true either. The testimony was when he authorized people, once he had approved them, to affix his signature, an electronic signature, but he personally approved the ones that he reviewed. He never delegated that authority to anybody else. I am over time. If I could, the one last, I'll give the case that Judge Callahan asked for. It's called Midland Atlantic. If you lie to a grand jury, if there's grave doubt, and it's on an important enough issue that it would cause the grand jury to act like a nullity, so it takes away their independence. Did that go to a petty jury trial after? Yes, it did. I believe it did. But Midland Atlantic is the one that splits Mechanic and Bank of Nova Scotia, and that's the most recent Supreme Court case on it. It supports our basis that if you lie to the grand jury on an important matter, it can't be cured if it deprives the grand jury's independence, and that's what we allege here. I thank you for your patience and for the extra time, Your Honors. I just have a couple of points. I'd like to take the opportunity to address Judge Owen's hypotheticals. So the first hypothetical, you had the guy with the CVS pharmacy who called legal and legal said go ahead. I think what the government is really saying is, yes, we can prosecute that person, but we wouldn't. And so the government is really saying, hey, look, you know, if the law is unclear, you shouldn't consider it, you should rely on us. And I don't think that's what we want to do. I think the law has to be, you know, the scope of the defense is the scope of the defense, and here the government should be required to prove willfulness. The second hypothetical was the we have the Dr. Carroza Act. And the answer is that, yes, the answer, if we have the Dr. Carroza Act and Internet prescribing is legal based on an online questionnaire, it would be very difficult to prosecute the doctor because essentially a relationship would be formed. But you still could, as Judge Callahan pointed out, you still could prosecute the doctor based on other factors. But I think that the government's response here, even if they — I mean, first of all, I disagree there wasn't a per se case. They did present a lot of different evidence. But the lack of an in-person examination was absolutely central, absolutely central. And so the law regarding that was critical to the defense and the question of good faith. The last point I'd like to add, and this is — this really goes probably more to the evidentiary issue, but, you know, the — it's a fundamental principle that the — that the genuineness of good faith is often related to whether or not it's reasonable. And something is judged on whether it's reasonable on what the person relied on. And so the fact that there were these hard documents coming from the government that the defendants relied on was an absolutely critical portion of the defense. And that is why their exclusion rendered the trial unfair. Thank you. Thank you, Ms. Landau. I have seven points. I'll try to get through them. I know that's a little ambitious. First, to answer Judge Callahan, the money laundering argument is made at pages 44, 106, and 111 in our brief. Second, fundamentally, our argument is, yes, some evidence, some corroboration of good faith was admitted, and then the instruction took that defense away. How did it take that defense away? It undermined Feingold, because under an aid or abettor theory or a conspiracy theory, willfulness, that is, the violation of a known legal duty, has to be part of the definition. The Court took that away. Mr. Johnson — But willfulness is not in the statute. It's not in the statute. But Feingold, it is an element, for sure, under a conspiracy theory. Even the government's principal case, Tobin, acknowledges that. And whether you call it willfulness or specific intent, we're talking about a purpose, and that's clearly mandated by an aid or abettor theory. And those are the theories, the aid or abettor theory. As the government has just conceded, the government just said a few minutes ago that Mr. Johnson and Mr. Napoli came in under an aid or abettor theory. An aid or abettor theory and a conspiracy theory require specific intent or some species of willfulness. And the Court took that away. So some corroboration— But you're not arguing that the aid or abettor statute ups the ante with respect to the principal statute. I'm arguing that it requires specific intent to violate the law. And that's the argument we make in our brief, Your Honor. Well, I understand that you've made that argument. The principal statute of 841 does not require willfulness. To convict you on aid or abettor or conspiracy, you may have to have some specific intent that you intended to join whatever was the violation of 841. But it does with respect to physician-issued prescriptions. And with respect to that particular area which comes close to the FIERA lines of cases, a complex regulatory scheme, verification of an independent legal duty, yes, under those circumstances where mistake of law is really a mistake or mistake of fact is really a mistake of law, you have a heightened standard. That's the argument we make in the brief, and that's the argument that I think protects, in particular, Mr. Johnson and Mr. Napoli. I'm running out of time. May I, may I? I'll give you another minute. Thank you very much, Your Honor. Another fundamental point I want to make is that Mr. Johnson shouldn't be necessarily folded in with everybody else. We've already addressed the financial piece of it. But Mr. Johnson wasn't in from the beginning. He wasn't designing things. He wasn't making the major decisions. And so I would urge the Court to resist the temptation to consider the defendants as a whole as the government has argued. Mr. Johnson, Mr. Napoli, Mr. Carrozza each have particular aspects. And I would, with respect to Mr. Johnson, I want to point out a couple of things that I think are fundamental. All the Skype messages which were, I think, the heart of the government's proof in this case, all of the Skype messages were retrieved from Mr. Johnson's servers in Pekin, Illinois. Why? That's an indication of a lack of consciousness of guilt. Mr. Johnson kept all of these things. He could have, with the click of a button, gotten rid of just about all of the evidence the government presented in the way of Skypes and everything else. He didn't do it because he didn't have a guilty consciousness. And I think if you look at Mr. Johnson in particular, you'll see many indications of that. There's no evidence whatsoever. I think my able colleague, Ms. Gray, misspoke when she suggested that Mr. Johnson logged in as a doctor. There's absolutely no evidence of that. She might have been confusing Robin Bloom, who admitted that she did that before trial, and then at trial couldn't remember whether or not she did it. She was probably the principal witness against Mr. Johnson. And finally, to address Judge Owen's hypothetical about the pharmacist, the interesting thing there is the pharmacist under the CFR is a practitioner. The CFR directly applies to the pharmacist. Under that scenario, Mr. Johnson wouldn't be subject to prosecution because the pharmacist has a direct duty under 1306, 1306.04 that someone like Mr. Johnson didn't have. And to make matters worse, the district court refused our instruction, which would have clarified to the jury that someone like Mr. Johnson or Mr. Napoli could rely on the good faith of the pharmacists or of the doctors in the same way that this pharmacist relied, in your hypothetical, Your Honor, on the attorney. I know that I'm over. If the Court has any questions, I'm happy to respond. Thank you very much. Thank you very much, Your Honor. We thank all counsel for the argument. Thank you. The United States v. Carrozza is submitted, and the Court is adjourned. All rise.
judges: Bybee, Callahan, Owens